| Bridgeton 396 Broadway Fee, LLC v HiRise Engg. P.C. |
|---|
| 2024 NY Slip Op 31161(U) |
| April 5, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 652458/2018 |
| Judge: Sabrina Kraus |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. SABRINA KRAUS**

*Justice*

PART _____ 57M _____

-------------------------------------------------------------------------------X

BRIDGETON 396 BROADWAY FEE, LLC

INDEX NO. _____ 652458/2018 _____

Plaintiff,

- v -

**Decision After Trial**

HIRISE ENGINEERING P.C.,

Defendant.

-------------------------------------------------------------------------------X

## BACKGROUND

Plaintiff is the owner and developer of the Walker Hotel located in downtown Manhattan. This litigation arises out of the conversion of said property from an office building to a hotel. Nonparty Al Rajhi Hospitality ("ARH") was the original lender on the project. ARH entered a contract with Defendant to be the lender's representative on the project. After ARH terminated the contract, it assigned the contract to Plaintiff for the purpose of commencing this litigation. Plaintiff commenced this action as the assignee of ARH asserting breach of contract and professional malpractice.

The Court held a bench trial which commenced on January 9, 2024, continued January 10, 11, 12, 16, 17, and concluded on February 21.

Primarily based on Plaintiff's failure to allege and establish any monetary damages suffered by ARH as a result of the alleged breach of contract and professional malpractice, the Court finds that Plaintiff failed to prove a *prima facie* case, and the action is dismissed.

[* 1]

## FINDINGS OF FACT

Plaintiff is the owner of the property known as 396 Broadway, New York, New York pursuant to a deed dated March 27, 2014. (J-64). Atit Jariwala ("Jariwala") was the sole owner of Bridgeton Holdings LLC, the developer of the Project. Jariwala wanted to convert the property from an office building to a hotel.

The $42 million purchase of the building was financed by ARH, an entity that was owned by Fawaz Al Rajhi, who went to business school at Stanford with Jariwala. ARH was also the construction lender for the Project.

Bridgeton is Jariwala's company. Jariwala has an undergraduate degree from Yale University in economics and a master's in business administration from Stanford University. He started Bridgeton right before business school and built it right out of business school. Jariwala had no prior construction experience and had not been involved in any major construction projects before this Project, which had a budget of $60 million.

Defendant is an engineering company that typically provides consulting service on construction projects to lenders.

On January 7, 2014, Bridgeton retained DXA Studio Architecture PLLC ("DXA") as the Project Architect (J-44). Thirty percent ($90,000) of DXA's total fees were for construction administration services, which included conducting weekly site meetings with the owner, contractor, sub-contractors and engineers; verifying conformance of the construction work with the intent of the construction documents; and reviewing the contractor's payment requisitions.

In 2014, Jariwala hired David Amirian ("Amirian") to serve as the Owners Representative on the Project. In 2015 and 2016, Jariwala and Amirian shared offices. Amirian was presented with a proposed written agreement for his services on August 28, 2015, but

[* 2]

neither he nor Jariwala ever executed the agreement. The agreed compensation for Amirian's services was 5% of the profits and a fee.

In February 2015, Plaintiff signed a contract with Atlantic State Development ("ASD") for ASD to become the construction manager of the project for approximately $20 million. Jariwala hired ASD against the advice of Wayne Norbeck of DXA. Norbeck had advised against hiring ASD because ASD's primary experience was in residential properties in Long Island. Jariwala decided to hire them anyway because ASD's bid was lower than others submitted.

Pursuant to §10.1.4(f) of the Bridgeton/ASD contract, the form of the lien waiver was subject to the approval by the Owner. Amirian's uncontroverted testimony was that Jariwala approved the form of the lien waiver.

On February 26, 2015, DXA signed Payment Application #1 for the Project certifying requested payments and deposits of $1,629,132.98.

On July 30, 2015, ARH and Defendant signed a contract (J-3) for Defendant to provide engineering services as the Lender's representative for the Project. The contract was executed by Jariwala as an agent of ARH.

Defendant was founded by Joseph Celentano. Celentano has a degree in civil engineering from Syracuse University and has been a licensed professional engineer in the State of New York since 1990.

Celentano credibly testified that the prime reason for a bank engineer is to provide the lender with information so that it can make decisions such as whether to take a project on. Defendant would then assist the lender by providing it with information concerning funding for a project. Bank engineers never supervise a work site or certify payment requisitions which are certified by the project architect. A bank engineer wants to see the architect's certification

[* 3]

because the bank engineer is only at the site for a few hours a month at most and the architect is more involved with the project, going to the site more often to make sure that the work is being performed in accordance with the plans it prepared and then certifying that payment for the work requested on a payment application was done. Defendant always asks for the architect's certification and relies upon it.

Celentano further testified that every lender is different in terms of what backup documentation is required and there is no set way of what is done; it is ultimately up to the lender to decide what is required. Defendant provides a wish list to the lender of what documents the lender should obtain but Defendant rarely receives all of the information on that list. The backup documentation required by the particular lender is usually contained in the building loan agreement. For the Project, Defendant was never provided with the loan agreement.

Pursuant to the contract, Defendant was to provide ARH with two services. The first was to prepare a Plan & Cost Review ("PCR") at a cost of $3,750.00. The second was to provide a monthly construction progress report ("CPR") at a cost of $750.00 per month.

The contract is a succinct two-page document. As to the PCR Defendant the contract provides in pertinent part:

> The Plan & Cost Review is intended to provide Al Rajhi Hospitality with sufficient information to evaluate the project feasibility, including the completeness of the project information, the general conformance with industry standards and the adequacy of the construction costs in order to evaluate the bank's position as a secured lender.
>
> The report will provide the following information:
> • Analysis and narrative description of the plans
> • Analysis of the construction hard cost budgets and contractor costs
> • Opinions of the sufficiency and reasonableness of the budgets
> • Descriptions of all construction risks that could impact timely completion, cause cost overruns, impact construction quality, cause latent defects, or otherwise affect the bank's collateral.
> • Recommendations pertaining to any construction risks
> • A review of submitted project documentation requested

[* 4]

- A schedule review

As to the monthly reports the contract provided in pertinent part that Defendant would:

Perform site observations of the project and prepare written reports as required by the bank. The reports will include:

- Review and comments on the construction operations manpower adequacy, Application for Payment, Change Orders, Lien Waivers, stored material, progress schedule and conformance with the submitted plans. The report will also include photographs of the progress.

The contract provided that ARH could request additional services at specified hourly rates and contained the following disclaimer:

HiRise Engineering, P.C. is not responsible for the work performed by or malfeasance of the general contractor or subcontractors, errors and/or omissions by the Professional Architects/Engineers of record, nor responsible for any other provider of product and/or services in connection with this project. HiRise Engineering, P.C. is not responsible for technical inspection of the project as these are the responsibility of the professionals of record tied to the project along with the general contractor/subcontractors engaged to perform the construction. Due to our limited observations on site, HiRise Engineering, P.C. cannot ensure code compliance required by the governing municipality. All items relating to the above statement shall be the responsibility of the professionals of record tied to the project.

The day after the contract was entered with Defendant, and prior to Defendant having any time to prepare the PCR, Plaintiff wired to ASD for the amount approved in Payment Application #1. ASD payment application number one was certified for payment by Wayne Norbeck, DXA's Architect on July 31, 2015, in the amount of $1,629,132.98.

Akash Sharma ("Sharma") was another member of the Bridgeton organization that was an investment associate. He started working for Bridgeton as soon as Jariwala graduated from business school. Sharma knew Jariwala through working together on an internship. Sharma is now president and a partner in the company with a 25% ownership interest.

No documentation pertaining to ARH was offered in evidence at trial. Although there was testimony that ARH was the lender on the project, no loan documentation was submitted in

[* 5]

evidence, nor was there any record of any monies being transmitted from ARH to Plaintiff in the trial record. There was no evidence at trial as to whether there were any defaults on the loan or whether ARH suffered any actual money damages as a result of the alleged breach of contract and alleged malpractice.

Defendant issued its first draft of the PCR on August 17, 2015 (J-7). The PCR listed what documents should be submitted to Defendant along with any request for funding. The PCR advised the lender that the project was months behind schedule and that the schedule would need to be adjusted. The PCR indicated that more than 80% of the subcontracts were bought out based upon information provided by Bridgeton.

On August 19, 2015, Jariwala emailed (Ex BB) Defendant and requested certain changes to the PCR including changing the construction period to August 3, 2015, to October 31, 2016, removing the section of the report regarding construction schedule concerns, and increasing the percentage of subcontracts bought out to 100%.

On August 20, 2015, Defendant issued a revised PCR (Ex Z) which incorporated the revisions requested by Jariwala. Some additional minor changes were thereafter requested, and a second revised report was issued on August 24, 2015.

On October 26, 2015, Defendant issued CPR #1 based upon a site visit of October 19, 2015. The report noted that 46% of the funding to date represented deposits and that it was at the discretion of the lender to fund the deposits. The report attached copies of ASD payment applications one and two and copies of change orders and lien waivers.

On November 13, 2015, Defendant issued CPR #2 based upon a site visit of November 3, 2015. The report noted that 45% of the funding to date represented deposits and that it was at the discretion of the lender to fund the deposits. It was also noted that Amirian

reported that the HVAC subcontractor requested an additional deposit to purchase materials and mobilize on site. Amirian testified that he recommended approval of the second deposit, discussed it with Jariwala and Jariwala agreed to fund the second deposit. The report attached the ASD payment application three and lien waivers.

On January 5, 2016, Defendant issued CPR #3 based upon a site visit of December 1, 2015. The report noted that 42% of the funding to date was represented by deposits and attached ASD payment application four and lien waivers.

On January 4, 2016, the New York City Department of Buildings issued a stop work order due to the absence of a hoist. Without the hoist installed work in the building was not permitted above 75 feet. The stop work order remained in place through late March 2022.

On January 28, 2016, Amirian resigned. He sent an email advising that The Amirian Group would no longer be representing Bridgeton for the Project. He indicated the reason for leaving the Project was that there was a lot of conflict on the Project concerning the budget, design and responsibility. He noted that ASD was hired based upon a set of plans that was only 50-55% complete and the scope of the design was in excess of the budget. This created an internal conflict as to who was at fault; the contractor, the designer, or the owner for not properly putting forward a budget for the Project.

On February 22, 2016, Defendant issued CPR #4 based upon a site visit of January 11, 2016. The report noted that no payment application was submitted by ASD during the relevant period due to a stop work order being issue.

On March 4, 2016, Defendant issued CPR #5 based upon a site visit of February 18, 2016. The report noted that 39% of the funding to date was represented by deposits and attached ASD payment application five and lien waivers.

[* 7]

On April 1, 2016, Plaintiff hired Conor O'Byrne as a Vice President of Construction and Development. He was assigned to the Project and reviewed the plans and attended job walk throughs. When O'Byrne first began working for Jariwala, O'Byrne got the impression that Jariwala did not know much about construction and, as a result, O'Byrne conceded that Jariwala made mistakes with regard to the Project. These mistakes included hiring ASD, issuing the payments to ASD and hiring Amirian.

With regard to mistakes committed by Amirian, O'Byrne indicated that it was a mistake by Amirian to recommend in a memo to Jariwala that payment of $1.2 million in deposits was necessary for ASD to start the work. Jariwala was the ultimate decision maker as to whether payments would be made to ASD, including payments for all of the deposits.

O'Byrne also found issues regarding the services provided by DXA. He found its plans to be lacking and that DXA had improperly signed off on the requisition payments.

On April 20, 2016, Defendant issued CPR #6 based upon a site visit of April 5, 2016. The report noted that 25% of the funding to date was represented by deposits and that, although no application for payment was submitted, Plaintiff requested that a progress report be issued.

On April 25, 2016, O'Byrne emailed Defendant to confirm that Defendants services were being terminated. O'Bryne stated that Plaintiff had a new construction loan in place, and the new lender preferred to use their own consultant. O'Bryne added he looked forward to working with Defendant again in the future.

In July 2016, Plaintiff fired ASD on the recommendation of O'Byrne. ASD was responsible for determining the means, methods and how the sequence of the work at the Project was to be performed. O'Byrne considered it negligence on ASD's part to have performed work

[* 8]

at the site out of sequence. The termination letter (Ex J-25) to ASD, dated July 29, 2016, was drafted by O'Byrne for Jariwala to sign. The letter alleged that ASD was holding or had received the benefit of at least $1.5 million in unspent advances, amounts overbilled and in payments made by Bridgeton on behalf of ASD.

In August 2016, Plaintiff hired CBRE pursuant to a written agreement (Ex J-33) to determine the amount of work that had been completed to date, prior to the commencement of work by a new contractor.

On December 1, 2016, Plaintiff's sent a Notice of Claim (Ex Q) to Wayne Norbeck of DXA, alleging that DXA was negligent in its review and approval of ASD's payment requisitions and that there was a significant discrepancy between the actual work in place and the amounts approved for payment.

Jariwala sent a second letter to Norbeck on December 20, 2016, raising the same claims, but agreeing none the less that DXA would remain on the Project for work and fees specified therein.

On February 20, 2017, ARH assigned its contract with Defendant to Plaintiff (J-4). Jariwala signed on behalf of both the assignor and assignee.

In March 2017 litigation was commenced in New York County Supreme Court, under Index Number 651402/2017 between ASD and Plaintiff. The action settled in December 2017 with Plaintiff receiving just under $600,000 in proceeds as a result of the settlement and a return of a deposit from a subcontractor.

## CONCLUSIONS OF LAW

### *Cause of Action for Breach of Contract*

[* 9]

The first cause of action asserts a breach of contract. The elements of a breach of contract claim are (1) the existence of a contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) resulting damages. *Alloy Advisory,LLC v. 503 West 33rd Street Associates, LLC,* 195 A.D.3d 436 (1st Dept. 2021); *Markov v. Katt*, 176 A.D.3d 401 (1st Dept. 2019); *Harris v. Seward Park Housing Corp.*, 70 A.D.3d 25 (1st Dept. 2010).

Defendant complied with its contractual obligations as demonstrated by the contents of its reports, both the PCR and CPRs.

Plaintiff relies almost entirely on outside evidence to argue that Defendant had obligations which although not specified in the contract it was contractually bound to perform. For example, Plaintiff argues that Defendant breached its contract by approving ASD payment requisitions. There is no contractual obligation on the part of Defendant to approve the payment requisitions rather Defendant was to issue monthly reports which commented " on the construction operations manpower adequacy, Application for Payment, Change Orders, Lien Waivers, stored material, progress schedule and conformance with the submitted plans." The report was also include photographs of the progress. Defendant did this. Defendant did for example indicate that the amount of deposits on the initial payment requisition and on subsequent payment requisitions was higher than usual but left it up to the lender to make a determination as to whether to fund those deposits.

Jariwala, as an agent for the lender, was aware of everything that Plaintiff complains Defendant should have alerted the Defendant of, including the form of the lien waivers and the fact that the subcontracts were not fully executed. In fact, it was the lenders agent who asked that the initial report be revised to indicate that the contracts were 100% bought out.

[* 10]

The best evidence of what parties to a written agreement intend is what they say in their writing. *Slamow v. Del Col*, 79 N.Y.2d 1016 (1992). A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself and which there is no reasonable basis for a difference of opinion. *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (2002). A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties. *Greenwich Capital Financial Products, Inc. v. Negrin*, 74 A.D.3d 413, 903 N.Y.S.2d 346 (1st Dep't 2010).

Here, the terms of the contract were clear and unambiguous as to what services Defendant agreed to provide. The contract lists specifically what information the PCR and CPRs would contain and the reports did contain all of the information that they were supposed to. The contract also provided that Defendant was not responsible for the malfeasance of the general contractor (ASD) or the errors and/or omissions by the architect (DXA).

The job of the Defendant as the lenders representative was to provide the lender with information as the project progressed and point out any risks associated with funding. Defendant was not responsible under the contract for supervising the construction, certifying the percentages of work completed, and determining if the work complied with code provisions. Defendant was hired to give an initial report regarding the feasibility of the project as concerned the lender, and then at the rate of $750 per month, to visit the site monthly and provide progress reports.

Other professionals were tasked with certifying payment requisitions, supervising the construction and insuring compliance with code regulations. As noted above it is acknowledged by Plaintiff that Jariwala had no experience to undertake this project, that he hired a contractor

against the advice of his team who similarly lacked the necessary experience and that both the contractor and the construction supervisor were eventually fired due to their negligence/malfeasance on the Project. The damages that plaintiff suffered as result of these factors cannot become the responsibility of Defendant by virtue of the assignment at issue in this action.

The information contained in the PCRs that were issued, both the first draft and the subsequent revised PCRs issued to incorporate the changes requested by the lenders designated agents, contained all of the information that the contract indicated that the PCR would contain. The claimed issues concerning the lien waivers, subcontracts and deposits raised by Plaintiff do not warrant a different result since even the first draft of the PCR was issued 17 days after the first payment application was paid and well after the Project commenced. So, while a PCR is typically prepared for the lender to address the feasibility of a project, here Plaintiff had already commenced the Project and ARH had already agreed to fund the Project before Defendant was retained.

The CPRs were prepared by Defendant in accordance with its contractual obligations since each report reviewed and commented upon the specific categories of information listed in the contract. The information contained in the CPRs was also based upon the information and documents provided to Defendant by Plaintiff and its owner's representative Amirian, information upon which Defendant reasonably relied upon, particularly since it was provided by representatives of Bridgeton, who were also identified as being representatives of the lender ARH.

While plaintiff contends that Defendant allegedly breached its contract by failing to obtain and review the necessary Project documentation, it failed to introduce into evidence the

ARH/Bridgeton loan document. As conceded by O'Byrne, the documents that are required to be submitted by the contractor with the payment requisitions depend upon the loan requirements.

For reasons that were never offered at trial, not only were the loan documents never put into evidence, they were never provided to O'Byrne who testified that the documents that are required to be submitted by the contractor with the payment requisitions depend upon the loan requirements. They were never shown to Amirian, even after he asked Jariwala more than a dozen times to see the documents. Nor has anyone solely affiliated with ARH offered any evidence at the trial or executed any documents pertaining to the underlying transactions. The contract and assignment were both executed by Jariwala. In fact, as noted above, Jariwala executed the assignment of the contract both as assignor and assignee. Amirian testified he asked multiple times to meet with a representative of the lender that was not also affiliated with the owner and that never happened.

Even Plaintiff's expert Barone was never provided with a copy of the loan agreement based upon Plaintiff's expert disclosure which lists the documents that he did review in preparation for his testimony and his actual trial testimony that he had not seen any documents to indicate when, and if, there was an actual closing on the loan.

### Damages

Assuming *arguendo* that Plaintiff had established a breach of contract by Defendant, Plaintiff still failed to prove that ARH suffered any actual damages. In addition to the fact the loan agreement is not in evidence to establish that a loan from ARH to Plaintiff ever occurred, the record is also devoid of any evidence to establish that ARH issued any funding for the Project. The only evidence submitted by Plaintiff was testimony from Jariwala that ARH wired money into Plaintiff's account.

[* 13]

In fact, Plaintiff does not even allege that ARH suffered any actual damages. Instead, Plaintiff essentially argues, that since it became the assignee of the contract after the termination of the contract,15 the relevant measure of damages are the damages suffered by Plaintiff, not ARH. This argument fails as a matter of law.

An assignee stands in the shoes of an assignor and thus acquires no greater rights than its assignor. *American States Insurance Co. v. Huff*, 119 A.D.3d 478 (1st Dept. 2014); *Trisingh Enterprises v. Kessler*, 249 A.D.2d 45 (1st Dept. 1998); *Matter of Stralem*, 303 A.D.2d 120 (2nd Dept. 2003); *Arena Construction Co., Inc. v. J. Sackaris & Sons, Inc.*, 282 A.D.2d 489 (2nd Dept. 2001); *Federal Financial Co. v. Levine*, 248 A.D.2d 25 (2nd Dept. 1998).

Moreover, an assignee never stands in a better position than his assignor. *New York and Presbyterian Hospital v. Country-Wide Insurance Co,.* 17 N.Y.3d 586 (2011); *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121 (1975); *Nationwide General Insurance Co. v. South*, 223 A.D.3d 41 (1st Dept. 2024); *Madison Liquidity Investors 119, LLC v. Griffith*, 57 A.D.3d 438 (1st Dept. 2008); *TPZ Corp. v. Dabbs*, 25 A.D.3d 787 (2nd Dept. 2006).

When a valid assignment is made, the assignee steps into the assignor's shoes and acquires whatever rights the latter had. *In re Stralem*, 303 A.D.2d 120, 123 (2003). The assignee is not entitled to any greater rights than the assignor had because the assignor cannot convey an interest greater than it possessed. *Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 362 (S.D.N.Y. 2003). Because an assignee is in no better or worse position than the assignor, the assignee can have no greater right to bring suit than would have been possessed by the assignor. *Gibraltar Petroleum Corp. v. Bank Sepah*, 526 F. Supp. 560, 561 (S.D.N.Y. 1981) An assignment does not modify the terms of the contract. *Citibank, N.A. v. Tele/Res., Inc.*, 724 F.2d 266, 269 (2d Cir.1983).

Thus, the assignment did not change the measure of damages under the contract from damages suffered by ARH to damages suffered by Plaintiff. As Plaintiff failed to establish that any monies were due to ARH based on the alleged breach the action must be dismissed. *Durham Commercial Capital Corp. v Wadsworth Golf Construction Company of the Midwest, Inc.* 160 AD3d 1442 (4th Dept 2018) (*case properly dismissed were plaintiff failed to establish any sums were due to assignor*).

Plaintiff's rights were derivative. *Madison Liquidity Investors 119, LLC v Griffith* 57 AD3d 438 (1st Dept 2008). The only thing Plaintiff acquired by virtue of the assignment was the right to sue for any damages ARH would have been entitled to, and as discussed above no such damages were alleged or established at trial.

### Cause of Action for Professional Malpractice

In addition to the failure to prove damages which requires dismissal of both causes of action, Plaintiff failed to provide the expert testimony necessary to establish a claim for professional malpractice.

The elements of a cause of action for professional malpractice are a departure from accepted standards of practice of that profession in the relevant area and that the departure was a proximate cause of the plaintiff's injury. *Mary Imogene Bassett Hosp. v. Cannon Design, Inc.*, 127 A.D.3d 1377, 1380 (2015).

> A claim of malpractice against a professional engineer requires expert testimony to establish a viable cause of action (*see e.g. 530 E. 89 Corp. v. Unger,* 43 N.Y.2d 776, 402 N.Y.S.2d 382, 373 N.E.2d 276 [1977] ). "A claim of professional negligence requires proof that there was a departure from accepted standards of practice, and that the departure was a proximate cause of the injury" (*Hamilton Textiles v. Estate of Mate,* 269 A.D.2d 214, 215, 703 N.Y.S.2d 451 [2000] ).

*Travelers Indem. Co. v. Zeff Design*, 60 A.D.3d 453, 455 (2009).

[* 15]

None of the witnesses presented by Plaintiff on its direct case provided testimony which established that Defendant deviated from accepted standards of practice in the services it provided as the lender's representative. Defendant did present a witness, Joseph Wallwork who opined that Defendant's reports did meet industry standards. The Court did not find Wallwork's testimony to be convincing or reliable and does not accord his testimony any significant weight. However, considering the lack of proof on Plaintiff's *prima facie* case both as to damages and as to deviations from industry standards, the claim for professional malpractice is also dismissed.

## CONCLUSION

WHEREFORE it is hereby:

ORDERED that the action be and is hereby dismissed and the clerk is directed to enter judgment in favor of Defendant.

20240405145511SBKRAUS160BEBB683094C65BD3F04DC2B23D0DC

_____

**SABRINA KRAUS, JSC**

**DATE: 4/5/2024**

**Check One:** [X] **Case Disposed**     [ ] **Non-Final Disposition**

**Check if Appropriate:** [ ] **Other (Specify** _____ **)**